UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF KENTUCKY

IN RE:                                )
                                      )       CASE NO. 05-61805(2)
DECKER COLLEGE, INC.,                 )              Chapter 7
                                      )
        Debtor.                       )
                                      )
_____ )_____
                                      )
ROBERT W. KEATS, TRUSTEE              )
        Plaintiff,                    )
                                      )
v.                                    )       Adversary Proceeding No. 09-_____
                                      )
COUNCIL ON OCCUPATIONAL               )
EDUCATION, INC.,                      )
                                      )
SERVE:                                )
                                      )
    Gary Puckett                      )
    Registered Agent                  )
    Council on Occupational           )
      Education, Inc.                 )
    41 Perimeter Center East, NE      )
    Suite 640                         )
    Atlanta, GA  30346,               )
                                      )
    Defendant.                        )
                                      )
_____ )

## **COMPLAINT**

Comes now Plaintiff, Robert W. Keats ("Trustee" or "Plaintiff"), in his capacity as

Trustee in Bankruptcy for the Estate of Decker College, Inc., d/b/a Decker College of

Business ("Decker College," "Decker" or the "College") and, by and through counsel, for his

complaint against defendant, Council on Occupational Education, Inc. ("COE"), states as

follows:

## **INTRODUCTION**

1.     Plaintiff files this action for damages to the College caused by COE's illegal, improper, and factually erroneous statements to the United States Department of Education (the "Department") that COE had not approved three Decker College degree programs (the "Hybrid Programs") for delivery using primarily on-line technology.

2.     As a result of COE's illegal, improper, and factually erroneous statements, the Department has refused to pay millions of dollars to Decker College under Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 *et seq.* (2004) (such funding, "Title IV Program Funding," and programs operated thereunder, "Title IV Programs"), which monies were due and owing to Decker College at the time COE made said illegal, improper, and factually erroneous statements.

3.     That refusal not only forced Decker College to close its doors but also prevented it from receiving millions of additional dollars in Title IV Program Funding to which it is entitled for the education Decker College provided to its students prior to being forced to close.

4.     Decker College has also been the subject of claims asserted against it by the Department to recoup $31,595,885 in Title IV Program Funding that the Department claims Decker College improperly disbursed based solely on COE's illegal, improper, and factually erroneous statements to the Department that COE had not approved the Hybrid Programs for delivery using primarily on-line technology.

5.    Also as a result of COE's illegal, improper, and factually erroneous statements, the entire value of Decker College, in an amount between $400,000,000 and $950,000,000, was totally destroyed.

6.    COE, which was the College's institutional accrediting body, had actual knowledge that the Hybrid Programs included a majority on-line component prior to approving them.

7.    Decker College disclosed the on-line nature of the Hybrid Programs in a number of meetings with COE representatives, in a variety of written materials and presentations made to COE, and in the College's separate applications to COE for approval of each of the Hybrid Programs that were submitted to COE in April and May 2004.

8.    Before COE falsely stated to the Department both orally and in writing that Decker College did not have approval to offer the Hybrid Programs in the manner in which they were delivered, COE had actual knowledge that the manner in which Decker College was operating the Hybrid Programs (a) included a majority on-line component, and (b) was within the scope of COE's approval of the Hybrid Programs.

9.    In accordance with its own practices and procedures, COE verified that the manner in which Decker College was operating the Hybrid Programs included a majority on-line component and was within the scope of COE's extension of accreditation to the Hybrid Programs on at least two separate occasions prior to falsely stating the contrary to the Department both orally and in writing.

10.     COE's first verification was made by a COE Visiting Team in August 2004 and COE's second verification was made by a COE Focused Review Visiting Team in June 2005.

11.     In conducting their independent reviews of Decker College, each of these separate COE teams closely scrutinized all aspects of the Hybrid Programs.

12.     COE never questioned whether the Hybrid Programs were within the scope of COE's extension of accreditation to the Hybrid Programs or the manner in which Decker College was operating the Hybrid Programs based on the reviews conducted by the COE Visiting Team in August 2004 or the COE Focused Review Team in June 2005.

13.     However, when the Department questioned COE's approval of the Hybrid Programs, instead of acknowledging and defending its extension of accreditation to the Hybrid Programs in June 2004 and its twice having verified that the Hybrid Programs were being continuously operated by Decker College in the manner in which they had been approved by COE, namely, with a majority on-line component, COE instead falsely informed the Department that "these programs were not perceived as online programs by COE," (Letter from COE Associate Executive Director Alex Wittig to the Department dated June 17, 2005 (the "June 17 Letter")), and that "COE did not approve these associate degrees to be offered primarily through distance education."  (Letter from COE Executive Director Gary Puckett to the Department (Aug. 23, 2005) (the "August 23 Letter")).

14.     At the point in time that COE made these statements to the Department regarding its accreditation of the Hybrid Programs, COE was itself in the process of being reviewed by the Department to determine whether COE's own status as an accrediting

agency officially recognized by the U.S. Secretary of Education would be continued. COE was greatly concerned that the truth about its extension of accreditation to the Hybrid Programs would negatively impact that review, and, as a result, made the false statements identified herein.

15.     Consequently, contrary to its practices and procedures, COE did not send Decker College copies of either the June 17 Letter or August 23 Letter or otherwise inform the College of the Department's questions or COE's responses.

16.     The College only learned of the existence of the August 23 Letter from the Department. Thereafter, by letter dated August 30, 2005, Decker's Chief Executive Officer, William Weld, immediately requested that COE issue a letter to the Department correcting the false statements in the August 23 Letter.

17.     In his letter, Mr. Weld noted that the August 23 Letter was sent to the Department without any consultation with or notice to Decker, and without any opportunity for Decker to provide evidence regarding the Hybrid Programs pursuant to COE practices and procedures. In his letter, Mr. Weld also warned COE that failure to correct the inaccuracies in Dr. Puckett's August 23 Letter would result in closure of Decker College because the effect of the August 23 Letter would be to cut off the College's access to Title IV Program Funding.

18.     By letter dated September 2, 2005, Dr. Puckett advised Mr. Weld that COE was treating Mr. Weld's August 30, 2005 letter as a request to the Commission of COE to review Dr. Puckett's August 23 Letter at its September 19, 2005 meeting.

19. In connection with that meeting, the College submitted to the Commission of COE voluminous materials detailing the extensive disclosures between it and COE regarding the Hybrid Programs and their majority on-line delivery mode (the "Decker Response") and Mr. Weld made a personal presentation to COE at its September 19 meeting.

20. By letter dated September 30, 2005, the Department denied Decker's application for recertification and its Program Participation Agreement with the Department ceased that day. The Department cited COE's August 23 Letter stating that COE did not approve the Hybrid Programs to be offered primarily through distance education as the key factor in its denial of recertification.

21. By letter dated September 30, 2005 (Letter from COE Executive Director Gary Puckett to Decker College (the "September 30 Letter")), Dr. Puckett advised that COE had affirmed Dr. Puckett's August 23 Letter, as written.

22. The September 30 Letter did not address any of the facts set out in the Decker Response or Mr. Weld's oral presentation. Instead, the September 30 Letter merely rubber-stamped Dr. Puckett's August 23 Letter, which, on the record before COE was unsupported, unsupportable and factually incorrect.

23. Based on COE's illegal, improper, and factually erroneous statements to it, the Department has withheld all Title IV Program Funding from Decker College since June 2005 and has asserted a repayment liability of $31,595,885 against Decker on the ground that Decker never had the appropriate accreditation from COE to permit Decker to award Title IV Program Funding to students enrolled in the Hybrid Programs.

24.     COE's illegal, improper, and factually erroneous statements to the Department caused the College such severe financial distress that the College's creditors filed a petition for involuntary bankruptcy for Chapter 7 liquidation in the United States Bankruptcy Court for the Western District of Kentucky, Louisville Division on October 24, 2005.

25.     As a direct result of COE's actions, Decker was forced to close, thereby destroying Decker College's goodwill and reputation, its entire value and such other harms as will be proven at trial.

## PARTIES

26.     Robert W. Keats was appointed Trustee in Bankruptcy for the case of Decker College, Inc., d/b/a Decker College of Business by the United States Bankruptcy Court for the Western District of Kentucky, Louisville Division (the "Court") on November 4, 2005. Decker College's bankruptcy case was filed in this Court on October 24, 2005 as Case No. 05-61805(2) when various creditors of Decker filed a petition for involuntary bankruptcy for Chapter 7 liquidation of the College.

27.     Decker College, which at all times relevant was a Delaware corporation with its principal place of business in Louisville, Kentucky, operated postsecondary vocational schools on campuses in Kentucky, Georgia, Indiana, and Florida and had an enrollment of approximately 4,500 students at the time COE made its illegal, unsupportable, and false statements to the Department.  At all times relevant, Decker College's main campus was located in Louisville, Kentucky, and the College also maintained an additional branch campus in Louisville.

28.     COE, which is a Georgia corporation with its principal place of business in Atlanta, Georgia, is an accrediting association officially recognized by the U.S. Secretary of Education pursuant to 20 U.S.C. § 1099b.

29.     As an officially recognized accrediting association, COE's accreditation of a postsecondary institution is one of the statutory prerequisites for a postsecondary institution to be eligible to participate in the Title IV Programs.

30.     When a postsecondary institution that is accredited by an accrediting association officially recognized by the U.S. Secretary of Education seeks to add new programs, the accrediting association's extension of accreditation to those new programs is one of the legal prerequisites for the postsecondary institution to award Title IV Program Funding to students enrolled in those new programs.

31.     COE was the accrediting association for Decker College at all times relevant hereto.

**JURISDICTION AND VENUE**

32.     The Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1334 and 28 U.S.C. § 157.

33.     This action constitutes a core proceeding pursuant to 28 U.S.C. § 157, in that, among other things, it relates to the property of the estate and affects the liquidation of the assets of the estate.

34.     This Court has personal jurisdiction over COE.

35.     Venue for this action is proper in this judicial district and division under 28 U.S.C. § 1409 because Decker College's bankruptcy case is pending in this district and

division. At all times relevant, Decker maintained its main campus in Louisville, Kentucky, and also maintained an additional branch campus in Louisville during much of the relevant time period. A large number of students enrolled in the College attended classes and/or resided in this district.

## GENERAL ALLEGATIONS

**A.     Decker College Provided Comprehensive Information to COE Regarding the Hybrid Programs Prior to COE's Extension of Accreditation.**

36.     Decker College was founded in 1989 as Computer Education Services, Inc. to provide high quality vocational education to fill critical employment needs in the business trades in the southeastern region of the United States.

37.     At all times relevant hereto, Decker was continuously accredited by COE since 1992.

38.     Prior to extending accreditation to the Hybrid Programs, COE had actual knowledge that the Hybrid Programs were taught using an integrated residential and distance learning approach with the majority of the Hybrid Programs being taught on-line.

39.     The College's first meeting with COE regarding what became the Hybrid Programs occurred in August 2002.

40.     Among the COE officials who attended the August 2002 meeting were Dr. Gary Puckett and Sue Schooler. Daniel Bennet, President of the National Center for Construction Education and Research ("NCCER") also attended the meeting.

41.     At all times relevant hereto, COE has viewed NCCER as an expert in the field of instruction for the construction trades.

42.     During the meeting, representatives of Decker College and Mr. Bennet described the College's plans to develop new associate degree programs in the construction trades that would be offered through an integrated combination of on-line education and a residential component constituting the hands-on elements of the curricula.

43.     The principal purpose of that meeting was to obtain COE's approval for Decker College to proceed to develop the Hybrid Programs using the NCCER curricula with the majority of the Hybrid Programs being taught on-line.

44.     COE provided that approval.

45.     A subsequent meeting between representatives of Decker College and COE staff occurred in September 2003 at COE's offices in Georgia.

46.     At the meeting, representatives of Decker College made a formal presentation regarding what became the Hybrid Programs.

47.     During that meeting, Decker's representatives described in detail the nature, structure, and majority on-line component of the Hybrid Programs.

48.     Among the COE officials who attended the September 2003 meeting were Dr. Harry Bowman, Dr. Gary Puckett, and Sue Schooler.

49.     At the time of the September 2003 meeting, Dr. Bowman was Executive Director of COE.

50.     Shortly after the September 2003 meeting, Dr. Puckett was promoted to the position of Executive Director of COE.

51.     In addition to Decker College personnel, the September 2003 meeting was also attended by Robin Baliszewski, President of Pearson Education/Prentice Hall, and Dr. Dan Cooper of Active Learning.

52.     At the time of the September 2003 meeting, Pearson Education/Prentice Hall and Active Learning had well-established international reputations in the development and delivery of on-line courses.

53.     Prior to the September 2003 meeting, Pearson Education/Prentice Hall and Active Learning had worked with Decker College to develop an online version of the NCCER curricula.

54.     This online version of the NCCER curricula supplemented traditional instruction.

55.     The online version of the NCCER curricula developed by Decker with the assistance of Pearson Education/Prentice Hall and Active Learning also facilitated the accelerated distance learning environment, while ensuring that students would be able to readily access the learning materials, appropriately develop their skills through the combination of on-line and residential delivery characterizing the Hybrid Programs, and be tested to ensure measurable outcomes.

56.     The College's explanation of the proposed new programs at the September 2003 meeting at COE's offices was accompanied by a PowerPoint presentation by Dr. Dan Cooper of Active Learning, titled "e-Learning Construction Trade."

57.     Dr. Cooper's PowerPoint presentation clearly demonstrated Decker College's intent to create construction crafts Associate of Applied Science degree programs that would rely on on-line technology to deliver the majority of the course content.

58.     At the September 2003 meeting, Decker's representatives also described in detail to Dr. Puckett and other COE staff the important role of NCCER in creating the curricula for the Associate of Applied Science degree programs Decker College was then developing.

59.     At the conclusion of the September 2003 meeting, COE's Executive Director, Dr. Bowman stated, "You don't have to worry about persuading us on distance education. This is the wave of the future," or words to that effect.

60.     In November 2003, Dr. Bowman invited representatives of Decker College including William Weld to make a presentation to the Executive Committee of COE regarding the Hybrid Programs.

61.     At the time, Mr. Weld was a member of Decker's Board of Directors.

62.     Decker's presentation to the Executive Committee of COE occurred at a breakfast meeting held in Atlanta, Georgia.

63.     On March 3, 2004, representatives from Decker College met with Dr. Susan Sclafani.

64.     At the time of the meeting, Dr. Sclafani was Counselor to the Secretary of Education.

65.     At the March 3, 2004 meeting with Dr. Sclafani, representatives of Decker

College made a PowerPoint presentation titled "Decker College – Distance Education

Demonstration Program (DEDP) Proposal."

66.     Decker's presentation to Dr. Sclafani included the following statement:

> The Council on Occupational Education (C.O.E.) is a national
> accrediting agency that is committed to assuring quality and
> integrity in career and workforce development.  **The C.O.E. is
> the accrediting agency which monitors and evaluates
> Decker College under Department of Education guidelines
> and has been fully informed and advised as to our
> eLearning initiatives.  Their feedback and support for the
> program has been invaluable.**  It is our belief that the C.O.E.
> recognizes our educational model as being one that addresses
> the education and occupational needs of an underserved market
> and will be fully supportive of our proposed Distance
> Education Programs.

(Emphasis added).

67.     This statement confirmed the important role of COE as a resource for Decker

College in its development of new programs in general and the Hybrid Programs in

particular.

68.     The College sent COE a copy of its PowerPoint presentation to Dr. Sclafani.

69.     To obtain COE's approval of a new degree program, a postsecondary

institution such as Decker College that already was accredited by COE was required to

submit an application on forms prescribed by COE.

70.     COE's prescribed application forms asked specific questions concerning,

among other things, the new program's objectives, the curriculum, the qualifications of

faculty, and the adequacy of the resources that will be dedicated to the new program.

71.     On March 9, 2004, the College submitted its application to COE to extend the College's accreditation to include its new Associate of Applied Science Degree Program in Electrical Science ("Electrical Science AAS Degree Program").

72.     The College stated that it intended to begin its Electrical Science AAS Degree Program on April 19, 2004.

73.     In support of its application for COE to extend accreditation to the College's Electrical Science AAS Degree Program, Decker completed COE's application form, titled "APPLICATION: ASSOCIATE DEGREE PROGRAM," in the manner prescribed by COE.

74.     Question 9 on the COE application form required an indication of the types of classes offered as part of the Electrical Science AAS Degree Program.

75.     In response to Question 9, Decker College stated "Day/Night/On-Line courses."

76.     Decker College's response signified that a significant portion of the Electrical Science AAS Degree Program was delivered on-line.

77.     COE's application form nowhere requested the College to provide any information regarding the extent to which the Electrical Science AAS Degree Program was delivered on-line.

78.     In addition, as part of its application to COE, the College also provided a copy of its previously approved application to the Georgia Nonpublic Postsecondary Education Commission for state approval to offer its Electrical Science AAS Degree Program in Georgia (the "Georgia Electrical Science AAS Degree Program Application").

79.     Exhibit E to the Georgia Electrical Science AAS Degree Program Application, titled "Program of Instruction Outline," in Box 15 requested the College to "Check All Applicable Boxes to describe the Program of Instruction."

80.     One of the boxes the College checked was "Taught through distance education."

81.     This response signified that a significant portion of the Electrical Science AAS Degree Program was delivered on-line.

82.     Neither the College's response to Question 9 on said application nor the College's response to Box 15 resulted in COE inquiring further as to the extent to which the Electrical Science AAS Degree Program was delivered on-line.

83.     On April 12, 2004, the College submitted its application to COE to extend the College's accreditation to include its new Associate of Applied Science Degree Program in Carpentry Science ("Carpentry Science AAS Degree Program").

84.     The College stated that it intended to begin its Carpentry Science AAS Degree Program on June 1, 2004.

85.     In support of its application for COE to extend accreditation to the College's Carpentry Science AAS Degree Program, Decker completed COE's application form, titled "APPLICATION: ASSOCIATE DEGREE PROGRAM," in the manner prescribed by COE.

86.     Question 9 on the COE application form required an indication of the types of classes offered as part of the Carpentry Science AAS Degree Program.

87.     In response to Question 9, Decker College stated "Day/Night/On-Line courses."

88.     This response signified that a significant portion of the Carpentry Science AAS Degree Program was delivered on-line.

89.     COE's application nowhere requested the College to provide any information regarding the extent to which the Carpentry Science AAS Degree Program was delivered on-line.

90.     In addition, as part of said application to COE, the College also provided a copy of its previously approved application to the Georgia Nonpublic Postsecondary Education Commission for state approval to offer its Carpentry Science AAS Degree Program in Georgia (the "Georgia Carpentry AAS Degree Program Application").

91.     Exhibit E to the Georgia Carpentry Science AAS Degree Program Application, titled "Program of Instruction Outline," in Box 15 requested the College to "Check All Applicable Boxes to describe the Program of Instruction."

92.     One of the boxes the College checked was "Taught through distance education."

93.     This response signified that a significant portion of the Carpentry Science AAS Degree Program was delivered on-line.

94.     Neither the College's response to Question 9 on said application nor the College's response to Box 15 resulted in COE inquiring further as to the extent to which the Carpentry Science AAS Degree Program was delivered on-line.

95.     On May 5, 2004, the College submitted its application to COE to extend the College's accreditation to include its new Associate of Applied Science Degree Program in HVAC Science ("HVAC Science AAS Degree Program").

96.     The College stated that it intended to begin its HVAC Science AAS Degree Program on June 1, 2004.

97.     In support of its application for COE to extend accreditation to the College's HVAC Science AAS Degree Program, Decker completed COE's application form, titled "APPLICATION: ASSOCIATE DEGREE PROGRAM," in the manner prescribed by COE.

98.     Question 9 on the COE application form required an indication of the types of classes offered as part of the HVAC AAS Degree Program.

99.     In response to Question 9, Decker College stated "Day/Night/On-Line courses."

100.    This response signified that a significant portion of the HVAC Science AAS Degree Program was delivered on-line.

101.    COE's application nowhere requested the College to provide any information regarding the extent to which the HVAC Science AAS Degree Program was delivered on-line.

102.    In addition, as part of said application to COE, the College also provided a copy of its previously approved application to the Georgia Nonpublic Postsecondary Education Commission for state approval to offer its HVAC Science AAS Degree Program in Georgia (the "Georgia HVAC AAS Degree Program Application").

103.    Exhibit E to the Georgia HVAC Science AAS Degree Program Application, titled "Program of Instruction Outline," in Box 15 requested the College to "Check All Applicable Boxes to describe the Program of Instruction."

104. One of the boxes the College checked was "Taught through distance education."

105. This response signified that a significant portion of the HVAC Science AAS Degree Program was delivered on-line.

106. Neither the College's response to Question 9 on said application nor the College's response to Box 15 resulted in COE inquiring further as to the extent to which the HVAC Science AAS Degree Program was delivered on-line.

107. COE assigned experts in the fields covered by each of Decker's three applications to review those applications.

108. COE also conducted all follow-up that COE deemed necessary in order to determine whether to extend accreditation to the three new programs that were the subject of those applications.

109. The actions of COE identified in the two immediately preceding paragraphs were taken in accordance with its standard practices and procedures.

110. On June 15, 2004, Dr. Puckett, on behalf of the Commission of COE, sent Decker College a letter that stated that "[b]ased on the application and reader reports [for the offering of new associate degree programs], the Commission has extended accreditation to" Decker's HVAC Science AAS Degree Program and Carpentry Science AAS Degree Program.

111. On June 16, 2004, Dr. Puckett, on behalf of the Commission of COE, sent Decker a letter that stated that "[b]ased on the application and reader reports [for the offering

of new associate degree programs], the Commission has extended accreditation to" Decker's Electrical Science AAS Degree Program.

112.     Neither COE's June 15, 2004 letter nor COE's June 16, 2004 letter limited, qualified, or restricted COE's extension of accreditation to the Carpentry Science AAS Degree Program, Electrical Science AAS Degree Program and HVAC Science AAS Degree Program (collectively, the "Hybrid Programs") in any way.

113.     Accreditation decisions, such as COE's extension of accreditation to the Hybrid Programs, were not made by COE's staff.

114.     Rather, accreditation decisions were made by the Commission of COE.

115.     The Commission of COE is made up of 19 individuals.

116.     Throughout 2004 and 2005, all but three of the individuals who served on the Commission of COE were employed by postsecondary educational institutions accredited by COE.

117.     Throughout the period during which Decker was enrolling students in its Carpentry Science AAS Degree Program, Electrical Science AAS Degree Program, and HVAC Science AAS Degree Program, and awarding Title IV Program Funding to those otherwise eligible students, Decker College reasonably relied on COE's letters dated June 15 and June 16, 2004, which extended accreditation to the Hybrid Programs without qualification, limitation, or restriction.

**B.  Decker College and Its Hybrid Programs Underwent A Rigorous Review By COE as Part of COE's Process for Renewing Decker's Accreditation.**

118.    Because the status of a postsecondary institution as accredited by COE only continues for a certain period of time set by COE, each accredited institution undergoes a periodic review by COE for renewal of its accreditation in accordance with a schedule established by COE.

119.    COE undertook that review of Decker College's accreditation commencing in 2004.

120.    One of the principal steps in COE's process for reviewing a postsecondary institution for renewal of its accreditation is the institution's submission of a Self-Study Report to COE.

121.    As stated in COE's Handbook of Accreditation:  2004 Edition, effective as of February 1, 2004 ("COE's 2004 Handbook of Accreditation"), "[t]he primary purpose of the self-study is to examine an institution's qualifications for accreditation through a comprehensive self-evaluation conducted by institutional personnel."

122.    As also stated in COE's 2004 Self-Study Manual, "[t]he self-study process involves the total staff [of the institution] in evaluating the educational programs offered and the related functions of the institution in light of the institution's mission and the conditions and ten standards of the Commission."

123.    In addition, COE's 2004 Self-Study Manual dictates the following to the institution:  "When writing the [Self-Study] report, describe the institution in narrative form **as it exists** based on the criteria in each standard."  (emphasis added).

124.     Decker submitted a 2004 Self-Study Report to COE in August 2004 (the "August 2004 Self-Study Report").

125.     At that time, two Hybrid Programs were in operation at the College.

126.     These programs were the Electrical Science AAS Degree Program and Carpentry Science AAS Degree Program.

127.     Decker complied with COE's directive in its 2004 Self-Study Manual that Decker describe itself in narrative form as it then existed by describing in its August 2004 Self-Study Report the two Hybrid Programs in operation in August 2004.

128.     Specifically, the College's August 2004 Self-Study Report provided COE with the following description of the Electrical Science AAS Degree Program and the Carpentry Science AAS Degree Program:

> . . . All distance education students, both for the existing electrical science and carpentry programs and for other programs to be added in the future, have their class locations as follows:

| | |
|---|---|
| Weeks 1-5: | On site |
| Weeks 6-30: | On line |
| Weeks 31: | On-site |
| Weeks 32-45: | On-line |
| Week 46: | On-site |
| Weeks 47-60: | On-line |
| Weeks 61-62: | On-site |

129.     The above-quoted description of the 62 weeks of these two Hybrid Programs describes them as consisting of nine weeks of on-site instruction on a Decker campus and 53 weeks of on-line instruction.

130.    At the time it submitted its August 2004 Self-Study Report, Decker had not

yet put the HVAC Science AAS Degree Program into operation even though Decker College

had COE approval to do so.

131.    The College did not include its HVAC Science AAS Degree Program in the

above-quoted portion of its August 2004 Self-Study Report.  This is because COE's directive

in its 2004 Self-Study Manual required that Decker describe itself in the Self-Study Report in

narrative form as it then existed.

132.    In addition to the above-quoted description of the Electrical Science AAS

Degree Program and the Carpentry Science AAS Degree Program, the College's August

2004 Self-Study Report also stated that the College **began** "offering classes through Distance

Education in May 2004."

133.    In all COE accreditation matters, "Distance Education" is a term of art with a

defined meaning.

134.    The meaning of "Distance Education" was set out in COE's 2004 Handbook

of Accreditation, as follows:

> DISTANCE EDUCATION - **as defined, for the purpose of
> accreditation review, a formal education process in which
> the majority of the instruction occurs when student and
> instructor are not in the same place**.  Instruction may be
> synchronous or asynchronous.  Distance education may employ
> correspondence study, or audio, video, or computer
> technologies.

(Emphasis added).

135.    In all COE accreditation matters, Decker College used "Distance Education"

as a term of art with the meaning as defined in COE's 2004 Handbook of Accreditation.

136.	From August 23-26, 2004, an eight-member COE visiting team (the "August 2004 COE Visiting Team") visited Decker College as part of COE's comprehensive process for reviewing the College for renewal of its accreditation.

137.	Both the August 2004 COE Visiting Team's visit and the resulting 30-page Visiting Team Report were done in accordance with COE's 2004 Self-Study Manual and COE's 2004 Handbook of Accreditation.

138.	COE's 2004 Self-Study Manual stated that "a visiting team of professional colleagues during an extended visit will validate the description of the institution's staff findings found in the self-study report by reviewing the institution's operation, the educational programs, and the documents on file" and that the Visiting Team will assure itself that the Self-Study Report "reflects an accurate assessment of the institution."

139.	COE's 2004 Handbook of Accreditation stated that "[t]he primary responsibility of the visiting team is to determine whether or not the institution is in compliance with the standards and criteria required for accreditation by the Council."

140.	Decker College's accreditation liaison with COE's August 2004 Visiting Team was Dr. Richard-Laurent Barnett, Academic Dean and Executive Director, Division of Distance Education.

141.	Dr. Barnett met with members of the August 2004 COE Visiting Team throughout their visit.

142.	The August 2004 COE Visiting Team closely reviewed all of the College's programs.

143.     The members of the August 2004 COE Visiting Team specifically requested and received access to the on-line components of the Hybrid Programs.

144.     This access enabled the members of the August 2004 COE Visiting Team to directly evaluate the on-line components of the Hybrid Programs.

145.     Dr. Barnett met with August 2004 COE Visiting Team member Danny LeMoine for approximately three hours during the visit to review in substantive detail how Decker College was utilizing on-line learning to deliver certain portions of the Hybrid Programs.  This review specifically included the occupational portions of the curricula.

146.     Mr. LeMoine responded enthusiastically to the on-line delivery system, including the availability of library resources and examination methodology.

147.     Mr. LeMoine indicated that he was pleased to learn that instructors were available to students on a regular basis via a variety of modes.  He also acknowledged the impressive foundation and structure of the Hybrid Programs.

148.     At the conclusion of his three-hour session, Mr. LeMoine said he was very impressed with the hybrid delivery model, including the program structure, the learning platform, the curriculum, and the range of faculty qualifications and experience.

149.     Mr. LeMoine asked to return with another member of the August 2004 COE Visiting Team the following day to re-examine the on-line component of the Hybrid Programs.  Mr. LeMoine stated that the purpose of his request was so that he could, as he put it, "share all of these riches."

150.     Mr. LeMoine returned the next day with another member of the August 2004 COE Visiting Team.  Together, they extensively reviewed the on-line learning component of the Hybrid Programs.

151.     The Visiting Team Report issued by the August 2004 Visiting Team as a result of its four-day visit answered "Yes" to both of the following questions:  "The institution has informed the Commission [of COE] of all planned and unplanned substantive changes" and "Documents the institution has filed with the Commission [of COE] accurately represent the status of the institution."

152.     The findings of the August 2004 COE Visiting Team included the following:

(a) the majority of each of the Hybrid Programs was being offered through an on-line delivery method,

(b) the Hybrid Programs were being offered as approved by COE, and

(c) the Hybrid Programs had not been substantively changed since being approved by COE.

153.     Thus, the findings of the August 2004 COE Visiting Team squarely contradict the illegal, improper, and factually erroneous statements COE made to the Department regarding the Hybrid Programs both orally and in writing.

154.     Throughout the period during which Decker was continuing to enroll students in the Hybrid Programs and awarding Title IV Program Funding to those otherwise eligible students, Decker College reasonably relied on (a) COE's letters dated June 15 and June 16, 2004, extending accreditation to the Hybrid Programs without qualification, limitation, or restriction, and (b) the August 2004 COE Visiting Team's findings that (i) each of the

College's Programs, including but not limited to the Hybrid Programs, was being offered as approved by COE, and (ii) the Hybrid Programs had not been substantively changed since being approved by COE.

C.   **The Department's Inquiries to COE Regarding COE's Extension of Accreditation to Decker College's Hybrid Programs Were Made at the Same Time that COE Was Itself Being Reviewed by the Department For Renewal of Its Own Status as an Accrediting Agency Duly Recognized by the U.S. Secretary of Education.**

155.   Beginning in the Spring of 2005, COE became involved in a series of communications with Department officials regarding the Hybrid Programs. Those communications were initiated by Ralph LoBosco, the Department's Area Case Director in Kansas City.

156.   Mr. LoBosco had a conflict of interest in any matter involving Decker College and should have recused himself from involvement in any matter concerning Decker College.

157.   Mr. LoBosco's conflict arose from the fact that Decker's Chief Executive Officer was William Weld.

158.   Before Mr. LoBosco began his employment with the Department and Mr. Weld became Chief Executive Officer of Decker, Mr. Weld was the United States Attorney for Massachusetts.

159.   In his capacity as United States Attorney, Mr. Weld investigated and successfully prosecuted Wilfred American Education Corporation ("Wilfred") for fraud involving Title IV Program Funding.

160.   Mr. LoBosco was a senior employee of Wilfred at the time of Mr. Weld's investigation of Wilfred.

161.    Mr. LoBosco lost his job with Wilfred when Mr. Weld's investigation and subsequent prosecution of Wilfred resulted in Wilfred's closure.

162.    Mr. LoBosco's subsequent employment by the Department was at a substantially lower salary than he had earned at Wilfred.

163.    The appearance of impropriety resulting from these facts should have caused Mr. LoBosco to recuse himself from having any role in any matter involving an entity of which Mr. Weld was Chief Executive Officer.

164.    Nevertheless, by 2005, Mr. LoBosco had upon his own volition begun to involve himself in matters involving Decker College by, among other things, making inquiries to COE regarding the College.

165.    Mr. LoBosco made inquiries to COE regarding COE's extension of accreditation to the Hybrid Programs.

166.    Mr. LoBosco also made inquiries to COE regarding the extent of the on-line portion of the Hybrid Programs COE had approved.

167.    Mr. LoBosco also contacted individuals within the Department of Education regarding COE's extension of accreditation to the Hybrid Programs.

168.    Mr. LoBosco personally contacted John Barth, Director of the Department's Accreditation and State Liaison Office, regarding the scope of COE's own recognition by the U.S. Secretary of Education to accredit on-line programs such as the Hybrid Programs.

169.    Mr. LoBosco also made sure to inform COE that he had contacted Mr. Barth.

170.     At all times relevant hereto, the Department's Accreditation and State Liaison Office has provided staff support to the U.S. Secretary of Education's National Advisory Committee on Institutional Quality and Integrity ("NACIQI").

171.     At the time of Mr. LoBosco's contacts with COE regarding its accreditation of the Hybrid Programs, COE had just filed with NACIQI COE's own Petition for Continued Recognition as a nationally recognized accrediting agency under 20 U.S.C. § 1099b.

172.     Mr. LoBosco made known to COE that he was aware of COE's pending Petition for Continued Recognition.

173.     COE had included in its Petition for Continued Recognition a request to the U.S. Secretary of Education to expand the existing scope of COE's recognition regarding programs taught primarily on-line.

174.     At the time of Mr. LoBosco's contact with COE regarding the extent of the on-line portion of the Hybrid Programs COE had approved, Mr. LoBosco made known to COE that he was aware that COE had made this request.

175.     Mr. LoBosco's interference in Decker's affairs was not limited to the facts detailed above.

176.     In addition, Mr. LoBosco sent a letter dated June 14, 2005, notifying Mr. Weld that, effective June 13, 2005, the Department had changed the method by which the Department would thereafter pay Title IV Program Funding to Decker.

177.     This letter was another example of Mr. LoBosco's independently initiated extensive involvement in matters involving Decker College.

178.    As a result of the change in method by which the Department would pay Title IV Program Funding to Decker, the College no longer could draw down any Title IV grant funds.

179.    Also as a result of this change, the College was prohibited from disbursing any Title IV loan funds without the Department's prior approval.

180.    Also as a result of this change, in order to obtain any Title IV Program Funding after June 13, 2005, Decker College first had to use its own funds to pay students the amount of any Title IV Program Funding that those students were eligible to receive and then seek reimbursement from the Department for those payments.

**D.      The Information COE Provided to the Department Regarding the Hybrid Programs, Both Orally and In Writing, Was Factually Incorrect.**

181.    On June 17, 2005, COE Associate Executive Director Alex Wittig sent a letter to Mr. LoBosco regarding the College.

182.    The June 17 Letter responded to Mr. LoBosco's question to COE regarding the extent of the on-line component of the Hybrid Programs COE had approved in June 2004.

183.    The June 17 letter stated that "these programs were not perceived as online programs by COE."

184.    That statement was false, as Mr. Wittig well knew.

185.    Approximately one year earlier, representatives of Decker College had personally met with Mr. Wittig in Atlanta, Georgia.  During that meeting Decker's representatives described in detail the nature, structure, and majority on-line component of the Hybrid Programs.

186.     Furthermore, before writing his June 17 Letter, Mr. Wittig intentionally did not review Decker College's August 2004 Self-Study Report or the resulting 30-page Visiting Team Report issued by the August 2004 COE Visiting Team following its four-day visit to the College.

187.     Instead, Mr. Wittig reviewed only the applications the College had submitted to COE on March 3, 2004, March 9, 2004, and April 12, 2004, respectively, which sought COE's approval of the Hybrid Programs.

188.     Mr. Wittig limited himself to those applications although he knew that they would not, by themselves, answer Mr. LoBosco's question regarding the extent of the on-line component of the Hybrid Programs.  Mr. Wittig did this because he knew that those applications he reviewed consisted of COE's prescribed forms and he also knew that those forms did not ask for information regarding the extent of the on-line component of offered programs.

189.     In addition, Mr. Wittig stated in his June 17 Letter that the College's applications to COE made "no mention of online instruction."

190.     That statement was false, as Mr. Wittig well knew.

191.     Mr. Wittig's statement was false because each of the College's applications to COE for the Hybrid Programs stated that they were "Day/Night/On-line courses," and also because in his June 17 Letter Mr. Wittig specifically referenced the "state approval applications" to Georgia, each of which Mr. Wittig knew stated that the Hybrid Programs were "Taught through distance education."

192.    If Mr. Wittig actually believed what he said in his June 17 Letter, that is, that Decker was operating the Hybrid Programs in a manner that COE had not previously approved, as its Associate Executive Director, he would have had COE initiate some formal action against Decker in accordance with COE's practices and procedures for postsecondary institutions that were violating COE accreditation standards.

193.    Such action on the part of Mr. Wittig would have been required of COE as an accrediting agency recognized by the U.S. Secretary of Education because at all times relevant hereto 34 C.F.R. § 602.20(a) has provided that "[i]f the [accrediting] agency's review of an institution or program under any standard indicates that the institution or program is not in compliance with that standard, the agency must − (1) Immediately initiate adverse action against the institution or program."

194.    However, because Mr. Wittig knew what he said in his June 17 Letter was false, Mr. Wittig did not have COE immediately initiate any action of any kind against Decker.

195.    In addition, because Mr. Wittig knew what he said in his June 17 Letter was false, he did not send Decker College a copy of his June 17 Letter.  The only person he copied was Dr. Puckett.

196.    On June 22-23, 2005, a three-member COE visiting team conducted a "Focused Review for Accreditation Compliance Issues" of Decker College ("June 2005 COE Focused Review Visiting Team").  This review resulted in a Focused Review Site Visit Report.

197.     No member of the June 2005 COE Focused Review Visiting Team had been part of the August 2004 COE Visiting Team.

198.     Under COE's 2004 Policies and Rules of the Commission, "[f]ocused review team visits are conducted when certain substantive applications are received or when, in the judgment of the Commission, a re-evaluation of the institution's compliance with the Commission's standards, criteria, conditions, policies, and/or procedures is necessary (cost to be borne by the institution)."

199.     As a direct result of Mr. LoBosco's contacts with the Department's Accreditation and State Liaison Office regarding COE, COE was greatly concerned as to how COE's extension of accreditation to the Hybrid Programs in June 2004 could impact COE's June 2005 Petition for Continued Recognition, which was then pending before the Department's Accreditation and State Liaison Office.

200.     Consequently, Dr. Puckett made sure that the focus of the June 2005 COE Focused Review Visiting Team was whether the Hybrid Programs or any of the other programs offered by the College were operating outside the scope of COE's accreditation.

201.     Dr. Puckett personally informed members of the June 2005 COE Focused Review Visiting Team before they visited Decker that the majority of the instruction in the Hybrid Programs was being offered on-line rather than in a traditional classroom.

202.     During their visit to Decker, members of the June 2005 COE Focused Review Visiting Team closely examined Decker's on-line programs, including accessing on-line sessions to experience for themselves the on-line delivery of instructional materials and information in the Hybrid Programs.

203. At the time of the visit, Dr. Richard-Laurent Barnett, Academic Dean and Executive Director, Division of Distance Education, was again Decker College's accreditation liaison.

204. Dr. Barnett distributed a variety of materials to the members of the June 2005 COE Focused Review Visiting Team.

205. The materials distributed by Dr. Barnett outlined the curricula, course titles, course descriptions, program schedule, and delivery mode for the Hybrid Programs.

206. Those materials also were explicit that the majority of the weeks spent in the Hybrid Programs were on-line and not on site and that the majority of the credits for the Hybrid Programs were earned for work done on-line and not on site.

207. During the visit, Dr. Barnett discussed the hybrid delivery mode with two members of the June 2005 COE Focused Review Visiting Team, Robert Teich and James Sprudel, for over an hour. This conversation included specific discussions about the combination of on-site and on-line training in the Hybrid Programs.

208. In the Focused Review Site Visit Report resulting from its focused visit to Decker College on June 22-23, 2005, the June 2005 COE Focused Review Visiting Team expressly acknowledged that the College was offering programs through (a) traditional classroom delivery, (b) hybrid delivery (part classroom - part on-line), and (c) entirely on-line.

209. The findings of the June 2005 COE Focused Review Visiting Team included the following:

(a) the Hybrid Programs as offered by Decker were within the scope of their COE accreditation as previously approved by COE,

(b) there had not been any unapproved substantive changes in the Hybrid Programs or in any of the College's other programs,

(c) the majority of each of the Hybrid Programs was being offered through an on-line delivery method,

(d) the Hybrid Programs were being offered as approved by COE, and

(e) the Hybrid Programs had not been substantively changed since being approved by COE a year earlier, in June 2004.

210.    With respect to the lack of a substantive change, as a result of its June 22-23, 2005 visit to Decker College, the June 2005 COE Focused Review Visiting Team answered the exact same question seeking information regarding the existence of any undisclosed substantive changes in exactly the same way as the August 2004 COE Visiting Team had.

211.    In fact, the wording of the question posed to the June 2005 COE Focused Review Visiting Team ("The Institution has informed the Commission of all planned and unplanned substantive changes") was identical to the wording of the question posed to the August 2004 COE Visiting Team.  The "Yes" answers to that question from the August 2004 COE Visiting Team and the June 2005 COE Focused Review Visiting Team were also identical.

212.    Thus, the findings of the June 2005 COE Focused Review Visiting Team squarely contradict the illegal, improper, and factually erroneous statements COE made to the Department about the Hybrid Programs.

213.     In addition to the findings of the August 2004 COE Visiting Team and the June 2005 COE Focused Review Visiting Team, COE publishes an Approved Program Verification list, which COE updated as of June 30, 2005.

214.     On June 30, 2005, COE faxed a COE Approved Program Verification list to Decker College.  The Approved Program Verification List expressly listed as accredited programs each of the Hybrid Programs, i.e., the Carpentry Science AAS Degree Program, the Electrical Science AAS Degree Program, and the HVAC Science AAS Degree Program, without limitation, qualification, or restriction.

215.     By publishing the COE Approved Program Verification list in June 2005 with actual knowledge of the delivery mode of the Hybrid Programs and actual knowledge that 53 of the 62 weeks of instruction in the Hybrid Programs were on-line, COE reaffirmed its June 2004 extension of accreditation to the Hybrid Programs with a majority of the content delivered on-line.

216.     Throughout the period during which Decker was enrolling students in its Carpentry Science AAS Degree Program, Electrical Science AAS Degree Program, and HVAC Science AAS Degree Program, and awarding Title IV Program Funding to those otherwise eligible students, Decker College reasonably relied on (a) COE's letters dated June 15 and June 16, 2004, extending accreditation to the Hybrid Programs without qualification, limitation, or restriction, (b) the findings of the August 2004 COE Visiting Team and the June 2005 COE Focused Review Visiting Team that each of the College's Programs, including but not limited to the Hybrid Programs, was being offered as approved by COE and

without any unapproved changes, and (c) the COE Approved Program Verification list published by COE in June 2005.

      **E.**      **The Department Continued to Make Inquiries to COE Regarding Its Approval of Decker College's Hybrid Programs, and COE Knew That Those Inquiries Would Directly and Adversely Impact the Department's Review of COE for Renewal of Its Status as an Accrediting Agency Recognized by the U.S. Secretary of Education.**

217.     On August 1, 2005, Mr. LoBosco sent a letter to Dr. Puckett regarding Decker.

218.     In the August 1, 2005 letter, Mr. LoBosco provided a Decker College course schedule to Dr. Puckett. The schedule reflected that eight weeks of the 66-week Hybrid Programs were delivered while the students were in residence on a Decker campus and the remaining 58 weeks were delivered on-line.

219.     Mr. LoBosco asked in the August 1, 2005 letter whether COE had accredited the Hybrid Programs. This was the same question that Mr. LoBosco had asked Mr. Wittig previously and the same question that Mr. Wittig had already answered in his June 17 Letter to Mr. LoBosco.

220.     The subject course schedule provided by Mr. LoBosco was almost identical to the schedule in the College's August 2004 Self-Study Report, set out, *supra*, that the College had submitted to COE almost one full year earlier, on August 10, 2004.

221.     Both the August 2004 COE Visiting Team and the June 2005 COE Focused Review Visiting Team had separately reviewed and separately validated the course schedule submitted to COE on August 10, 2004 as being within the scope of COE's extension of accreditation to the Hybrid Programs and not constituting a substantive change.

222. On August 18, 2005, Dr. Puckett and Mr. Wittig met in Washington, D.C. with Mr. Barth, Director of ED's Accreditation and State Liaison Office, and Mr. Mula, a member of Mr. Barth's staff. That meeting had been requested by Dr. Puckett to discuss COE's accreditation of the Hybrid Programs. Dr. Puckett knew that COE's accreditation of those programs was a matter of concern to Mr. Barth and Mr. Mula in connection with their ongoing review of COE's pending Petition for Continued Recognition. Dr. Puckett had requested the meeting with Messrs. Barth and Mula to address that matter.

223. During the August 18, 2005 meeting, Dr. Puckett falsely stated to Messrs. Barth and Mula that COE had not approved the Hybrid Programs with a majority on-line delivery mode.

224. There was no basis in fact for Dr. Puckett's statements to Messrs. Barth and Mula at the August 18, 2005 regarding COE's approval of the Hybrid Programs, as Dr. Puckett well knew.

225. By letter dated August 23, 2005, Dr. Puckett responded to Mr. LoBosco's August 1 letter and, in effect, repeated the false statements made by Mr. Wittig in his June 17 Letter and the false statements that Dr. Puckett had made to Mr. Barth and Mr. Mula during their August 18, 2005 meeting regarding the Hybrid Programs.

226. Specifically, Dr. Puckett stated in his August 23 Letter that COE had not approved the Hybrid Programs "to be offered primarily through distance education" and that COE had approved the Hybrid Programs "to be delivered using the traditional delivery mode including classroom/lecture hours and shop/lab hours."

227. There was no basis in fact for any of Dr. Puckett's statements in his August 23 Letter.

228. Dr. Puckett knew that the statements in his August 23 Letter and his statements to Mr. Barth and Mr. Mula during their August 18 meeting regarding the Hybrid Programs were false. At the time, Dr. Puckett knew his statements were squarely contradicted by (a) the disclosures in Decker's three separate applications to COE, (b) the information in the College's August 2004 Self-Study Report, and (c) the findings contained in the June 2005 Focused Review Visiting Team Report. Dr. Puckett also knew at the time that he had no independent information regarding the Hybrid Programs that would support his statements.

229. In addition, Dr. Puckett had personally attended a meeting in Washington, D.C. with Congressman John A. Boehner in May 2005. At the time, Mr. Boehner was the Chair of the Committee on Education and the Workforce of the U.S. House of Representatives. Dr. Puckett had personally requested Mr. Weld to arrange this meeting with Mr. Boehner. During the May 2005 meeting, Mr. Weld described in detail the nature, structure, and majority on-line component of the Hybrid Programs then being operated by Decker College.

230. At the time of his August 18 meeting with Mr. Barth and Mr. Mula and at the time he wrote his August 23 Letter, Dr. Puckett had no independent information regarding the Hybrid Programs that would support his statements.

231. Moreover, prior to the August 18 meeting and prior to sending the August 23 Letter, Dr. Puckett did not consult with (a) any of the eight members of the August 2004

COE Visiting Team, (b) any of the three members of the June 2005 COE Focused Review Visiting Team that had visited Decker College, (c) any of the members of the Commission of COE who had made the determinations to extend accreditation to the Hybrid Programs in June 2004, or (d) anyone from Decker College.

232. Dr. Puckett's affirmative representation in his August 23 Letter that he consulted with "COE staff" in preparing his August 23 Letter was a lie.

233. Dr. Puckett consulted with no one other than counsel for COE in preparing his August 23 Letter.

234. If Dr. Puckett actually believed what he said in his August 23 Letter, as its Executive Director, he would have had COE initiate some formal action against Decker in accordance with COE's practices and procedures applicable to postsecondary institutions that were violating COE accreditation standards.

235. Such action on the part of Dr. Puckett would have been required of COE as an accrediting agency recognized by the U.S. Secretary of Education pursuant to 34 C.F.R. § 602.20(a), quoted *supra*.

236. However, because Dr. Puckett knew that what he said in his August 23 Letter was false, Dr. Puckett did not have COE immediately initiate any action of any kind against Decker.

237. In addition, because Dr. Puckett knew that what he said in his August 23 Letter was false, he did not send Decker College a copy of his August 23 Letter.

238. The only person that Dr. Puckett copied on his August 23 Letter was Mr. Barth, Director of the Department's Accreditation and State Liaison Office.

239. By letter dated August 26, 2005 ("August 26 Letter"), Dr. Puckett provided Mr. Mula with a copy of Decker's August 2004 Self-Study Report. Mr. Mula was a member of Mr. Barth's staff at the Department's Accreditation and State Liaison Office. Dr. Puckett's letter responded to a request from Mr. Mula for the report.

240. Dr. Puckett knew that Mr. Mula was very familiar with accreditation matters. Dr. Puckett also knew that, because of this, Mr. Mula would immediately recognize that Decker College's August 2004 Self-Study Report established that COE knew, no later than when it received the report in August 2004, that Decker was offering the Hybrid Programs through a majority on-line component.

241. Moreover, COE had received the August 2004 Self-Study Report one full year before Dr. Puckett's and Mr. Wittig's August 18, 2005 meeting with Messrs. Barth and Mula.

242. Consequently, in his August 26 Letter to Mr. Mula, Dr. Puckett was forced to attempt to explain away the disclosures Decker College had made to COE regarding the Hybrid Programs in its August 2004 Self-Study Report. These disclosures included the above-quoted description of these 62-week programs as consisting of nine weeks of on-site instruction on a Decker campus and 53 weeks of on-line instruction.

243. In this respect, Dr. Puckett's August 26 Letter stands in marked contrast to Mr. Wittig's June 17 Letter and Dr. Puckett's August 23 Letter. Both of those two letters were sent to Mr. LoBosco but neither of those letters even referred to Decker College's August 2004 Self-Study Report. Moreover, neither Mr. Wittig's June 17 Letter nor Dr. Puckett's August 23 Letter provided Mr. LoBosco with a copy of the Decker's August 2004

Self-Study Report or mentioned the disclosures Decker College had made therein to COE about the Hybrid Programs and their majority on-line component by no later than August 2004.

244.    Dr. Puckett had no choice but to acknowledge in his August 26 Letter to Mr. Mula that Decker's August 2004 Self-Study Report "makes several references to distance education and describes the schedule [Decker has] been following."

245.    However, Dr. Puckett then stated that "the self-study is not the appropriate document to report a substantive change such as changing a traditional program to one that is offered by distance education."

246.    In so stating, Dr. Puckett affirmatively represented to the Department's Accreditation and State Liaison Office that Decker substantively changed the Hybrid Programs between the time COE accredited them on June 15 and 16, 2004, and the submission of the College's Self Study Report on August 10, 2004.

247.    Dr. Puckett knew that this representation was false.

248.    Dr. Puckett knew that his representation to the Department's Accreditation and State Liaison Office that Decker had substantively change the Hybrid Programs was false because both the August 2004 COE Visiting Team and the June 2005 COE Focused Review Visiting Team each independently found that the College was operating the Hybrid Programs, as well as all of its other Programs, in the manner approved by COE and that there had been no unapproved substantive changes whatsoever in any of those Programs.

249.     Dr. Puckett also knew that there were no facts to support his representation to the Department's Accreditation and State Liaison Office that Decker had substantively changed the Hybrid Programs.

250.     Rather, at all times relevant hereto, the Hybrid Programs were being offered within the scope of their accreditation by COE and without any unapproved substantive changes.

251.     This is proven by the following facts, among others:  (a) the College's August 2004 Self-Study Report disclosed that the Hybrid Programs were being delivered primarily on-line, (b) the Hybrid Programs were being offered in the manner described in the College's August 2004 Self-Study Report, (c) the August 2004 COE Visiting Team concluded that the Hybrid Programs were being offered as COE had approved them in June 2004, without any substantive change, and (d) the June 2005 COE Focused Review Visiting Team also concluded that the Hybrid Programs were being offered as COE had approved them in June 2004, without any substantive change.

252.     On August 30, 2005, Decker's Chief Executive Officer, William Weld, sent COE a letter.  In that letter, Mr. Weld requested that COE issue a letter to the Department correcting the erroneous statements in the August 23 Letter.

253.     Mr. Weld only knew about the August 23 Letter because he had been told of its existence by the Department.

254.     In his letter to COE, Mr. Weld noted that the August 23 Letter was sent to the Department without any consultation with or notice to Decker, and without any opportunity for Decker to provide evidence pursuant to COE procedures.

255.     Mr. Weld also warned COE in the letter that the failure to correct the erroneous statements in the August 23 Letter would result in closure of Decker College because of the effect the August 23 Letter would have on the College's access to Title IV Program Funding.

256.     Dr. Puckett replied to Mr. Weld's August 30, 2005 letter on September 2, 2005.  In that letter, Dr. Puckett advised Mr. Weld that COE was treating Mr. Weld's August 30, 2005 letter as a request to the Commission of COE to review Dr. Puckett's August 23 Letter at its September 19, 2005 meeting.

257.     Following receipt of Dr. Puckett's September 2, 2005 letter, the College submitted to COE the record of the key communications between it and COE regarding the Hybrid Programs (the "Decker Response").

258.     Thereafter, Mr. Weld made a personal presentation to COE at its September 19 meeting.

259.     At the September 19 meeting, COE staff presented no evidence contradicting in any manner the evidence presented by Decker College orally and in the Decker Response that (a) COE had actual knowledge that the Hybrid Programs included a majority on-line component prior to approving them, (b) COE had actual knowledge that the manner in which Decker College was operating the Hybrid Programs not only included a majority on-line component but also was within the scope of COE's approval of the Hybrid Programs immediately after approving the Hybrid Programs by virtue of the College's August 2004 Self-Study Report, and (c) in accordance with its own practices and procedures, COE had thereafter twice verified that the manner in which Decker College was operating the Hybrid

Programs (i) included a majority on-line component, (ii) was within the scope of COE's extension of accreditation to the Hybrid Programs and (iii) was as approved, without any substantive changes.

260.    By the end of the week of September 19, 2005, the Department had completed its review of the College's first two requests for payment under the method prescribed in Mr. LoBosco's June 14, 2005 letter to Mr. Weld.

261.    The total of the College's two requests was in the amount of $11,543,810.57. The first request, in the amount of $5,072,927.54, had been made on August 10, 2005, and the second request, in the amount of $6,470,883.03, had been made on September 8, 2005.

262.    The Department would have paid those amounts to Decker in September 2005 but for the August 23 Letter.

263.    Kent Talbert, the Department's then acting general counsel, stated to Decker at that time that "as long as the August 23rd letter from COE to the Department is there, that seems to mean and say that these programs were never approved, so we will not release funds to Decker," or words to that effect.

264.    On September 30, 2005, Dr. Puckett sent a letter to Mr. Weld (the "September 30 Letter").  The September 30 Letter advised that COE had affirmed Dr. Puckett's August 23 Letter, as written.  However, the September 30 Letter did not address any of the facts set out in the Decker Response or Mr. Weld's oral presentation to COE at the September 19, 2005 meeting.

265.    Instead, COE merely rubber-stamped Dr. Puckett's August 23 Letter, which was unsupported, unsupportable, and false.

266.    That same day, by letter dated September 30, 2005, the Department denied Decker's application for recertification.  The Department's action terminated the College's eligibility to participate in any of the Title IV Programs, effective September 30, 2005.  The Department cited COE's August 23 Letter and statement that COE had not approved the Hybrid Programs to be offered primarily through distance education as the key factors in its denial of recertification.

267.    On October 24, 2005, various creditors of Decker filed a petition for involuntary bankruptcy for Chapter 7 liquidation in the United States Bankruptcy Court for the Western District of Kentucky, Louisville Division.

268.    Decker was forced to close, thereby destroying Decker College's goodwill and reputation, its entire value, and such other harms as will be proven at trial.

269.    Based on the August 23 Letter and September 30 Letter, the Department ultimately disallowed at least $11,031,188 of the two above-referenced requests for payment in the total amount of $11,543,810.57.

270.    Based on the August 23 Letter and September 30 Letter, the Department has asserted a repayment liability against Decker in the amount of $31,595,885, representing the amount of Title IV Program Funding Decker College disbursed to otherwise eligible students in the Hybrid Programs since COE extended accreditation to those Programs in June 2004.

**F.    COE Knew that its Letters to the Department Would Destroy
Decker College But Decided to Lie to the Department Regarding
Its Extension of Accreditation to the Hybrid Programs to Protect
its Petition Seeking Renewal of its Status as an Accrediting Agency
Recognized by the Department.**

271.    At all times relevant hereto, COE well knew that Decker College's eligibility
to participate in the Title IV Programs was contingent upon the College's programs being
operated within the scope of COE's accreditation.

272.    At all times relevant hereto, COE well knew that the College could not
survive without continuing access to Title IV Program Funding.

273.    At all times relevant hereto, COE well knew that Title IV Program Funding
was only available to Decker students enrolled in programs that were being operated within
the scope of Decker's accreditation.

274.    At all times relevant hereto, COE well knew that any action on its part that
adversely affected the accreditation status of the Hybrid Programs prospectively would
render students enrolled in those programs no longer eligible for Title IV Program Funding.

275.    At all times relevant hereto, COE well knew that any action on its part that
adversely affected the accreditation status of the Hybrid Programs retrospectively would
result in the Department seeking to recover from Decker all Title IV Program Funding
disbursed to students who had been enrolled in the Hybrid Programs from their inception.

276.    Nowhere in the June 17 Letter, the August 23 Letter, or the September 30
Letter did COE admit that COE had actual knowledge that the Hybrid Programs included a
majority on-line component prior to approving them.

277. Nowhere in the June 17 Letter, the August 23 Letter, or the September 30 Letter did COE admit that COE had actual knowledge by virtue of the College's August 2004 Self-Study Report that the manner in which Decker College was operating the Hybrid Programs included a majority on-line component.

278. Nowhere in the June 17 Letter, the August 23 Letter, or the September 30 Letter did COE admit that COE had actual knowledge by virtue of the College's August 2004 Self-Study Report that the manner in which Decker College was operating the Hybrid Programs was within the scope of COE's approval of the Hybrid Programs.

279. Nowhere in the June 17 Letter, the August 23 Letter, or the September 30 Letter did COE admit that subsequent to extending accreditation to the Hybrid Programs, COE had twice verified that (a) the manner in which Decker College was operating the Hybrid Programs included a majority on-line component, and was within the scope of COE's extension of accreditation to the Hybrid Programs, and (b) the Hybrid Programs had been operated as approved, without any substantive changes.

280. Nowhere in the June 17 Letter, the August 23 Letter, or the September 30 Letter did COE admit the deficiencies in COE's own processes for accrediting programs that, like the Hybrid Programs, were delivered in part in a traditional classroom setting but primarily on-line.

281. Subsequent to the September 30 Letter, albeit far too late for Decker College or its students, COE was forced to admit to the Department's Accreditation and State Liaison Office and NACIQI in connection with their review of COE's June 2005 Petition for

Continued Recognition deficiencies in its quality assurance process for distance education programs.

282.    Specifically, COE admitted that it had failed "to include in its quality assurance process for distance education programs the development of a 'new program' application and approval procedures that addresses issues specifically applicable to distance education."

283.    Those admissions by COE had adverse consequences on COE.

284.    COE had tried to avoid those consequences by lying to the Department about its extension of accreditation to the Hybrid Programs.

285.    The deficiencies in COE's own processes for accrediting programs that, like the Hybrid Programs, were delivered in part in a traditional classroom setting but primarily on-line are reflected in the December 2005 Final Staff Report on COE's Petition for Continued Recognition prepared by the Department's Accreditation and State Liaison Office.

286.    That Report, which focused on COE's inability to properly assess distance education programs at COE-accredited institutions, stated in relevant part that:

> The agency [COE] needs to apply clear policies, procedures, and standards or interpretive criteria for evaluating distance education.  It needs to include the appropriate qualifications and training requirements for its site evaluation team members and decision making body, and it needs to provide evidence that it has reviewed and evaluated an institution for the rigor and quality of the distance education system against those policies, procedures, standards, and criteria.

287.    In its response to the Final Staff Report, COE admitted material deficiencies in its policies, procedures, standards, and criteria for reviewing and approving on-line

programs during the period before, during, and after its extension of accreditation to the Hybrid Programs.

288.    Specifically, COE "acknowledge[d] that it needs to develop and apply more comprehensive policies and procedures to document that the agency [COE] assures quality in distance education programs offered by COE-accredited institutions…" and to "include in its quality assurance process for distance education programs the development of a 'new program' application and approval procedure that addresses issues specifically applicable to distance education."

289.    As a result of COE's belatedly admitted deficiencies, the Department's Accreditation and State Liaison Office and NACIQI recommended that the Secretary of the Department defer action on COE's Petition for Continued Recognition due to "major compliance issues."  The Secretary did defer such action.

290.    In addition, on September 26, 2006, Dr. Puckett sent a memorandum to all COE member schools.

291.    That memorandum provides additional evidence that Dr. Puckett, Mr. Wittig, and COE were justified in their concerns about the adverse effects on COE from the Department finding out about COE's material deficiencies in its policies, procedures, standards, and criteria for reviewing and approving on-line programs during the period before, during and after its extension of accreditation to the Hybrid Programs.

292.    Dr. Puckett's memorandum sets forth in relevant part that:

> Recently, you received a letter from the United States Department of Education outlining action you should take if your institution offers programs over 50 percent via distance education.  Issues clarified by the letter were the following:

1. Programs that are provided 50 percent or more by distance education are eligible for Title IV only until December 31, 2007, unless COE's scope is expanded to include distance education.

2. Programs that are provided 50 percent or more by distance education must have been approved by COE before July 1, 2006 to be Title IV eligible.

3. Programs that are provided less than 50 percent by distance education are eligible for Title IV without regard to the December 31, 2007 deadline.

4. The continuation of eligibility does not apply to institutions not currently participating in Title IV.

The purpose of this letter is to provide, to the extent possible, assurance that the Council's recognition by the Secretary of Education will be expanded to include distance education upon recommendation by the Secretary's National Advisory Committee on Institutional Quality and Integrity when the Committee meets in June 2007. In June [*sic,* December] of 2005, the Department of Education deferred our renewal of recognition with an expansion of scope and requested that COE demonstrate experience in evaluating distance education.

293. Dr. Puckett's, Mr. Wittig's, and COE's concerns about the adverse effects on COE that would result if the Department discovered COE's material deficiencies in its policies, procedures, standards, and criteria for reviewing and approving on-line programs during the period before, during, and after its extension of accreditation to the Hybrid Programs caused them to lie to the Department both orally and writing about the Hybrid Programs.

294. As detailed above, these lies directly and proximately caused the failure of Decker College and the loss of its student body and other damages sought in this litigation.

## COUNT I
## Declaratory Judgment

295.     Plaintiff incorporates the allegations of paragraphs 1 through 294 above as if set forth fully herein.

296.     An actual controversy exists between Decker College and COE regarding whether COE approved the teaching of the Hybrid Programs with a majority on-line component when it extended accreditation to the Hybrid Programs in June 2004 and reaffirmed that approval on June 30, 2005.

297.     The August 23 Letter, which the Commission of COE subsequently affirmed as written in the September 30 Letter, falsely states that the Hybrid Programs were not approved to be taught with a majority on-line component.

298.     COE's extension of accreditation to the Hybrid Programs and its subsequent reaffirmation of that approval came with actual knowledge of their majority on-line component.

299.     As its entire support for its claim that Decker owes the Department $31,595,885 in Title IV Program Funding disbursed to students enrolled in the Hybrid Programs and its position that Decker College is not entitled to millions of additional dollars in Title IV Program Funding for the education Decker College provided to its students prior to being forced to close, the Department is relying solely on the statements in the August 23 Letter and September 30 Letter that COE never approved the Hybrid Programs to be offered with a majority on-line component.

300.     The Department has taken the position that it cannot go behind the August 23 Letter and September 30 Letter but, to the contrary, must accept them, which is precisely what the Department has done.

301.     The Department has taken the further position that for it to determine that Decker does not in fact owe the Department $31,595,885 in Title IV Program Funding disbursed to students enrolled in the Hybrid Programs and to consider Decker College's claim that it is entitled to millions of additional dollars in Title IV Program Funding for the education Decker College provided to its students prior to being forced to close, Decker would need to show that the August 23 Letter and September 30 Letter had been changed or overturned by a court.

302.     Therefore, if this Court were to so rule or otherwise hold that the statements made by COE regarding the Hybrid Programs in the August 23 Letter and September 30 Letter were factually incorrect, inaccurate or unsupported or that at times relevant hereto Decker operated the Hybrid Programs in the manner approved by COE and without any unapproved substantive changes, the Department would accept that decision and withdraw its claim that Decker owes the Department $31,595,885 in Title IV Program Funding disbursed to students enrolled in the Hybrid Programs.

303.     Decker also could then submit its claim to millions of additional dollars in Title IV Program Funding for the education Decker College provided to its students prior to being forced to close, and pursue its existing requests for reimbursement submitted in 2005.

304.     Despite due demand, COE has refused to withdraw or correct its false statements regarding its accreditation of Decker College and the Hybrid Programs.

305. Therefore, an actual case or controversy exists between Decker and COE, which directly relates to the property of the estate.

306. Decker College seeks a declaration from this Court, pursuant to its authority under 28 U.S.C. § 2201, that the statements made by COE regarding the Hybrid Programs in the August 23 Letter and September 30 Letter were factually incorrect, inaccurate, or unsupported, all statements made by COE that the Hybrid Programs were not approved for delivery in the manner in which they were offered were factually incorrect, inaccurate, or unsupported when made, and that at times relevant hereto Decker operated the Hybrid Programs in the manner approved by COE and without any unapproved substantive changes.

**COUNT II**
**Tortious Interference With Contract And Business Relations**

307. Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 306 as if fully set forth herein.

308. COE intentionally made the false and misleading statements set forth above to the Department regarding COE's extension of accreditation to the Hybrid Programs, including the false and misleading statements made orally and in COE's June 17 Letter, August 23 Letter, and September 30 Letter.

309. At the time that COE made the aforementioned false and misleading statements, COE had actual knowledge that:

    (a)    Decker College had many current enrollment contracts with its students;

(b)     Decker College would continue to attract additional students who also would enter enrollment contracts with the College in the future;

(c)     Decker College had an existing business relationship with the Department pursuant to which, among other things, the College already had received Title IV Program Funding from the Department in connection with its provision of educational services to students who had been enrolled in the Hybrid Programs and Decker expected to obtain additional Title IV Program Funding from the Department in the future, including without limitation reimbursement for tuition expenses incurred or expected to be incurred for students enrolled in the Hybrid Programs.

310.     By falsely claiming that COE never approved the Hybrid Programs to be taught in the manner Decker College was delivering them, and making the other false and misleading statements set forth above, COE deliberately, willfully, wantonly, intentionally, and maliciously with an intent to injure, without justification or privilege, unlawfully, improperly, and wrongfully induced or caused:

(a)     Decker College's students not to perform their contracts with the College;

(b)     Students who were expected to enroll in Decker and enter into contracts with the College in the future not to enroll in the College; and

(c)     Decker not to receive the amount of Title IV Program Funding that Decker expected to receive from the Department through, among other things, reimbursement and the Department to seek repayment of Title IV Program Funding that had already been paid to Decker.

311.    COE's conduct thereby caused or induced the breach of students' contractual obligations to Decker and the loss to Decker of the aforementioned business opportunities.

312.    As a direct and proximate result of this willful, wanton, malicious, oppressive, and tortious interference, Decker College has incurred substantial damages including, among other things, a loss of Title IV Program Funding, denial of Title IV Program Funding to which it is entitled, damage to its reputation, loss of goodwill, a loss of students, and the loss of its entire business in an amount to be proven at trial.

## COUNT III
## Negligent Misrepresentation

313.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 312 as if fully set forth herein.

314.    COE's June 17 Letter informed the Department that the Hybrid Programs "were not perceived as online programs by COE." This statement was false.

315.    COE's August 23 Letter informed the Department that "COE did not approve these associate degrees to be offered primarily through distance education." This statement was false.

316.    In its September 30 Letter, COE affirmed the August 23 Letter "as written" even though COE knew that the statements in the August 23 Letter that the Hybrid Programs were not approved for delivery via primarily distance education were false.

317.    Each of COE's communications with the Department, both orally and in writing, to the effect that (a) Decker College had not disclosed the on-line nature of the Hybrid Programs prior to COE's extension of accreditation to the Hybrid Programs, (b) that

the manner in which Decker College was operating the Hybrid Programs was not within the scope of COE's approval of the Hybrid Programs, and/or (c) that Decker College had changed the Hybrid Programs from traditional programs to programs the majority of which were delivered on-line between the time the Hybrid Programs had been approved by COE in June 2004 and the time of those statements by COE to the Department, was false.

318.   COE knew that each of the false statements referenced above was false at the time it was made.  This is because, among other things, (a) COE had actual knowledge that the Hybrid Programs included a majority on-line component prior to approving them, because of the disclosures Decker College made to COE both before and after COE extended accreditation to the Hybrid Programs including but not limited to Decker College's August 2004 Self-Study Report, and (b) COE verified that the manner in which Decker College was operating the Hybrid Programs included a majority on-line component and was within the scope of COE's approval of the Hybrid Programs in accordance with its own practices and procedures on at least two separate occasions.

319.   As an accrediting agency duly recognized by the U.S. Secretary of Education, COE knew that it had an obligation to provide information to the Department regarding its accreditation of Decker College pursuant to 34 C.F.R. § 602.27.

320.   34 C.F.R. § 602.27 provided as follows in relevant part at the time of COE's above-referenced communications to the Department regarding Decker College:

> The agency [COE] must submit to the Department –
>
> * * *
>
> (f) If the Secretary requests, information that may bear
> upon an accredited or preaccredited institution's compliance

with its Title IV, HEA program responsibilities, including the eligibility of the institution or program to participate in Title IV, HEA programs.  The Secretary may ask for this information to assist the Department in resolving problems with the institution's participation in the Title IV, HEA programs.

321.     COE knew that the Department would rely on the information COE provided to the Department regarding COE's extension of accreditation to the Hybrid Programs.

322.     COE also knew that the Department would rely on such information.

323.     COE knew that the statements made to the Department by COE in its June 17 Letter, August 23 Letter, and September 30 Letter regarding COE's extension of accreditation to the Hybrid Programs would result in students enrolled in the Hybrid Programs no longer being eligible to continue to receive Title IV Program Funding.  This is because, according to COE, the Hybrid Programs were not being offered within the scope of their accreditation.

324.     As a direct and proximate result of the false statements made to the Department by COE both orally and in its June 17 Letter, August 23 Letter, and September 30 Letter regarding COE's extension of accreditation to the Hybrid Programs, the Department took the position that students enrolled in the Hybrid Programs were not eligible to continue to receive Title IV Program Funding.

325.     The Department took this position based solely on its reliance on COE's statements that the Hybrid Programs were not being offered within the scope of their accreditation.

326.     COE knew that the statements made to the Department by COE both orally and in its June 17 Letter, August 23 Letter, and September 30 Letter regarding COE's

extension of accreditation to the Hybrid Programs would result in the Department asserting a claim against Decker to recover all Title IV Program Funding disbursed at any time to students in the Hybrid Programs. This result was based solely on the Department's reliance on COE's false statements that the Hybrid Programs had never been offered within the scope of their accreditation.

327. As a direct and proximate result of the false statements made to the Department by COE in its June 17 Letter, August 23 Letter, and September 30 Letter regarding COE's extension of accreditation to the Hybrid Programs, the Department has asserted a claim against Decker to recover all Title IV Program Funding disbursed at any time to students in the Hybrid Programs. This claim is based solely on the Department's reliance on COE's false statements that the Hybrid Programs were never offered within the scope of their accreditation.

328. As a direct and proximate result of COE's negligent misrepresentations to the Department, Decker College has incurred substantial damages including, among other things, a loss of Title IV Program Funding, denial of Title IV Program Funding to which it is entitled, loss of future anticipated Title IV Program Funding, damage to its reputation, loss of goodwill, a loss of students, and the loss of its entire business in an amount to be proven at trial.

## COUNT IV
### Breach Of Contract

329. Plaintiff incorporates allegations 1 through 328 above as if set forth fully herein.

330.     By applying to receive accreditation from COE and COE's agreement to undertake the accreditation process, Decker College and COE formed a valid contract, the terms of which include but are not limited to COE's published policies, procedures, practices, criteria, and standards and its By-Laws.

331.     COE had a valid contractual obligation to Decker College and every other member of COE to conduct all accreditation related activities in a competent manner.

332.     Prior to learning about the June 17 Letter and August 23 Letter, Decker College reasonably believed that COE conducted its accreditation related activities in a competent manner.

333.     Throughout the period in which Decker was enrolling students in the Hybrid Programs and awarding Title IV Program Funding to those otherwise eligible students, Decker College reasonably relied on, *inter alia*, (a) the disclosures Decker College made to COE regarding the Hybrid Programs prior to applying to COE to extend accreditation to those Programs, (b) COE's letters dated June 15 and June 16, 2004, extending accreditation to the Hybrid Programs without qualification, limitation, or restriction, (c) the disclosures Decker College made to COE regarding the Hybrid Programs in its August 2004 Self-Study Report, (d) the findings of the August 2004 COE Visiting Team, (e) the findings of the June 2005 COE Focused Review Visiting Team, and (f) COE's June 30, 2005 Approved Program Verification list.

334.     COE had a valid contractual duty to Decker College as a member of COE to provide truthful and accurate information to the Department regarding Decker College and the Hybrid Programs.

335.     COE had a valid contractual duty to Decker College as a member of COE

(a) to acknowledge to the Department the disclosures Decker College made to COE

regarding the Hybrid Programs prior to applying to COE to extend accreditation to those

Programs, (b) to defend COE's letters dated June 15 and June 16, 2004, extending

accreditation to the Hybrid Programs without qualification, limitation or restriction, (c) to

acknowledge to the Department the disclosures Decker College made to COE regarding the

Hybrid Programs in its August 2004 Self-Study Report, (d) to acknowledge and defend to the

Department the findings of the August 2004 COE Visiting Team, (e) to acknowledge and

defend to the Department the findings of the June 2005 COE Focused Review Visiting Team,

and (f) to acknowledge and defend to the Department COE's June 30, 2005, Approved

Program Verification list.

336.     COE materially breached that duty and its contract with Decker by doing none

of those things.

337.     COE also materially breached that duty by illegally, improperly, and falsely

informing the Department in the June 17 Letter that "these programs were not perceived as

online programs by COE," and in the August 23 Letter that "COE did not approve these

associate degrees to be offered primarily through distance education."

338.     COE's June 17 Letter, August 23 Letter, and September 30 Letter, as well as

the other acts detailed above, materially breached contractual duties owed to Decker College.

339.     As a direct and proximate result of these material breaches of contract, Decker

College has incurred substantial damages including, among other things, a loss of Title IV

Program Funding, denial of Title IV Program Funding to which it is entitled, damage to its

reputation, loss of goodwill, a loss of students, and the loss of its entire business in an amount to be proven at trial.

## COUNT V
### Negligence
### (In the alternative to Count IV for Breach of Contract)

340.     Plaintiff incorporates allegations 1 through 328 above as if set forth fully herein.

341.     COE held itself out to Decker and the public as an institution that provides guidance to institutions for the continual improvement of their educational offerings and related activities, that provides counsel and assistance to established and developing institutions, and that ensures that the processes of evaluation, policy-making, decision-making, and public participation accommodate the interests of member institutions.

342.     COE had a legal duty to adhere to this standard of conduct.

343.     In this context, Decker College reposed trust and confidence in COE as its accrediting agency and depended on COE to discharge its duty to provide fair and unbiased accreditation services to Decker College in a competent manner.

344.     COE had a legal duty to respond to the Department's questions about COE's accreditation of the Hybrid Programs truthfully, accurately, and with reasonable care.

345.     COE also had a legal duty to review all of the documentation in its possession regarding the Hybrid Programs before responding to the Department's questions.

346.     The documentation in COE's possession regarding the Hybrid Programs establishes without contradiction (a) that COE had actual knowledge that the Hybrid Programs included a majority on-line component prior to approving them, (b) that

immediately after extending accreditation to the Hybrid Programs, COE had actual knowledge that the manner in which Decker College was operating the Hybrid Programs not only included a majority on-line component but also was within the scope of COE's extension of accreditation to the Hybrid Programs by virtue of, *inter alia*, the College's August 2004 Self-Study Report, and (c) that after receiving the College's August 2004 Self-Study Report and in accordance with its own practices and procedures, COE had twice verified that the manner in which Decker College was operating the Hybrid Programs included a majority on-line component, was within the scope of COE's extension of accreditation to the Hybrid Programs, and was as approved, without any substantive changes.

347.    COE failed to review all of the documentation in its possession regarding the Hybrid Programs before responding to the Department's questions regarding the Hybrid Programs.

348.    COE's responses to the Department's questions about the Hybrid Programs were false and inaccurate.

349.    COE willfully and wantonly failed to exercise reasonable care and breached its legal duty to Decker College by providing false and inaccurate information to the Department regarding the Hybrid Programs.

350.    As a direct and proximate result of COE's breach of its duty to Decker College, Decker College has incurred substantial damages including, among other things, a loss of Title IV Program Funding, denial of Title IV Program Funding to which it is entitled, damage to its reputation, loss of goodwill, a loss of students, and the loss of its entire business in an amount to be proven at trial.

## COUNT VI
## Breach Of Contract
### (In addition to Count IV for Breach of Contract)

351.    Plaintiff incorporates the allegations contained in paragraphs 1 through 339 above as if set forth fully herein.

352.    COE had a contractual obligation to Decker College and every other member of COE not to charge inappropriate or excessive amounts to members for site visits or other services performed in connection with its accreditation related activities.

353.    COE had a contractual obligation to return to Decker College all amounts paid by Decker College to COE for site visits or other services performed in connection with its accreditation related activities in excess of the fair and reasonable costs for same properly charged by COE.

354.    COE has admitted that it currently holds $6,592.22 of Decker College funds that COE admits is in excess of the amounts COE claims as reimbursement COE for site visits or other services performed in connection with its accreditation related activities for Decker.

355.    Upon information and belief, COE is not entitled to the full amount of what it claims as reimbursement for site visits or other services performed in connection with its accreditation related activities for Decker and therefore owes Decker College an amount in excess of $6,592.22.

356.    COE failed to disclose to the Trustee that it had been holding said $6,592.22 until April 13, 2006, and since that time, COE has ignored the Trustee's demand that COE return said $6,592.22.

357.     These funds constitute the property of Decker's bankruptcy estate.

358.     As a direct and proximate result of this breach of contract, Decker College has been damaged in an amount no less than $6,592.22.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff asks for judgment:

(1)     issuing a declaration under Count I that, among other things, (a) the statements made by COE regarding the Hybrid Programs in the August 23 Letter and September 30 Letter were factually incorrect, inaccurate, or unsupported when made, (b) all statements made by COE that the Hybrid Programs were not approved for delivery in the manner in which they were offered were factually incorrect, inaccurate or unsupported when made, and (c) at all times relevant hereto Decker operated the Hybrid Programs in the manner approved by COE and without any unapproved substantive changes;

(2)     awarding Plaintiff damages under Counts II-VI in an amount to be determined at trial, including compensatory and consequential, as well as pre-judgment and post-judgment interest;

(3)     awarding Plaintiff punitive damages under Counts II, III, and V in an amount to be determined at trial;

(4)     awarding Plaintiff attorneys' fees and other expenses of this litigation; and

(5)     granting such other and further relief as the Court deems just and equitable.

Respectfully submitted this 15th day of December, 2009.

RESPECTFULLY SUBMITTED

 /s/
Robert W. Keats, Trustee
KEATS & SCHWIETZ, PLLC
P.O. Box 221377
Louisville, Kentucky 40252-1377
(502) 587-8787

And

Leslie H. Wiesenfelder
  (admitted in the District of Columbia)
Daniel D. Prichard
  (admitted in the District of Columbia)
DOW LOHNES PLLC
1200 New Hampshire Ave., NW
Washington, DC  20036
(202) 776-2000

Counsel for Plaintiff